Michael J. Langford #9682
LAW OFFICE OF MICHAEL J. LANGFORD, P.C.
43 East, 400 South
Salt Lake City, UT 84111
Telephone: (801) 328-4090
Fax: (801) 328-4099
Email: Michael@mjl-law.com

*Attorney for Defendant Robert G. Lustyik*

---

**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF UTAH, CENTRAL DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **SENTENCING MEMORANDUM** |
| **Plaintiff,** | |
| **vs.** | **Case No. 2:12 CR 645** |
| **ROBERT G. LUSTYIK,** | **The Honorable Judge Tena Campbell** |
| **Defendant.** | |

COMES NOW Defendant Robert G. Lustyik ("Mr. Lustyik"), by and through his attorney, Michael J. Langford, and submits this memorandum to assist the Court at his sentencing on March 30th, 2015. As will be discussed more fully below, Mr. Lustyik is a good man who overcame significant emotional and physical impediments to become a highly decorated Federal Bureau of Investigation ("FBI") Agent. Mr. Lustyik had a long and distinguished career protecting this great country before he lost his moral compass and committed his crimes. In stark and tragic contrast to where he was before, Mr. Lustyik now presently sits in a county jail awaiting this Court's sentencing, having lost everything that he worked so hard to achieve-including his job, and personal and professional reputation. At

1

sentencing he will stand before this Court a shamed and humbled man. He now pleads for this Court to take the totality of his circumstances into consideration in its application of 18 U.S.C. §3553(a) and deviate from the Guidelines when imposing sentence. In addition, the defense also submits the following commentary to the Presentence Investigation Report (PSR) and its relevant conduct factors. There are relevant conduct sentencing enhancements raised in the PSR, the source of which can only be the Government. The defense has discussed these factors with government counsel and takes exception to some of the factors mentioned and clarifies its position below.

## PRESENTENCE REPORT

The United States Probation Office prepared a Presentence Investigation Report ("PSR") in this case. *Presentence Investigation Report*, Mary Schuman, United States Probation Office, Revised version March 16th, 2015. Mr. Lustyik was indicted and charged with 11 counts. Mr. Lustyik, on the day of trial, pled guilty to all eleven counts. Mr. Lustyik unlike his co-defendants did not plea with the benefit of any agreement with the United States; Mr. Lustyik is truly at the mercy of the court.

Mr. Lustyik's guilt on all the charges, combined with the nature of the conduct underlying the offenses gives him a base offense level of 34 on the United States Sentencing Guidelines. The defense is challenging the +2 enhancement based on Mr. Lustyik's role. Mr. Lustyik is a Category I offender. Pursuant to the United States Sentencing Matrix, Mr. Lustyik faces a guideline recommendation of a sentence between 151 to 188 months. If Mr. Lustyik's challenge is accepted it would recalculate his base offense level to 32 with a guideline range of

2

121-151 months.

## MR. LUSTYIK'S CONDUCT DOES NOT WARRANT AN UPWARD ADJUSTMENT BASED ON HIS ROLE

In examining Lustyik's conduct throughout this case it is apparent that he was not an organizer, leader, manager, or supervisor in the criminal activity in this case. *USSG*, §3B1.1(c). The enhancement only applies when a defendant gives, "some form of direction or supervision to someone <u>subordinate</u> in the criminal activity for which the sentence is given." *United States v. Backas*, 901 F.2d 1528, 1530 (10th Cir. 1990)(emphasis added). In this case Mr. Lustyik was given directions, and was not directing.

Mr. Lustyik was from the beginning subordinate to Michael Taylor ("Taylor"). Taylor reached out to Mr. Lustyik, and initiated the majority of contact to Mr. Lustyik, in order to solicit him. Taylor sought to have Mr. Lustyik protect him from the ongoing Utah investigation and ultimate indictment. Through the scheme Taylor made promises of positions and payments to Mr. Lustyik and Thaler. In *Backas* the court found that the defendant qualified for the enhancement, because –in part- he supervised his doorman Mr. Johnson, directing and paying him. *Id.*. Similarly in this case Taylor, not Mr. Lustyik, is bribing and Thaler. Taylor was even referred to as the "Capt.," throughout the scheme.

Mr. Lustyik, similarly, cannot be said to be the organizer, leader, manager, or supervisor of Thaler. Thaler acted independently from Mr. Lustyik, and subordinate to Taylor. A review of the communications between Thaler and Mr. Lustyik show that Taylor is directing both of them to act; Thaler and Mr. Lustyik are acting cooperatively, not hierarchical, with each other. Their

3

communications show: 1, any money would be split, 2, that Thaler communicated on his own accord, 3, Taylor directed Thaler to communicate with Mr. Lustyik, and 4, Thaler and Mr. Lustyik worked collaboratively. *Presentence Report Investigation*, Mary Schuman, Office of Parole, points, 30, 26, 22, and 27- respectively. *See United States v. Banuelos*, 117 Fed. Appx. 697, 701, (where the defendant qualified as a supervisor for determining how and when activities would occur, keeping all the proceeds, and encouraging activity after expressed hesitation.).

Since Mr. Lustyik did not act as a directing agent in relation to Thaler, and obviously acted on Taylor's direction, Mr. Lustyik does not qualify for the 2 point enhancement under USS, § 3B1.1(c).

## 18 U.S.C. §3553(a) SENTENCING FACTORS

The Supreme Court in *United States v. Booker*, 125 S.Ct. 738 (2005) restored the District Court's ability to craft sentences tailored to the individual circumstances of a case and the particular characteristics of a defendant. *Booker* requires sentencing Courts to consider factors other than the Guideline Sentencing Range.[1]  18 U.S.C. §3553(a) provides that a sentencing Court must sentence below the applicable Guideline Range if such a sentence would be sufficient to achieve the purposes of punishment.

The Guideline Sentencing Range is but one factor that the Court must consider in arriving at the sentence. *Booker* requires the Court also consider (1) the nature and circumstances of the offense, and the history of and characteristics of the defendant; (2) the kinds of sentences available; (3) the need to avoid unwarranted sentencing disparity; and (4) the need to provide

---

1 *United States Sentencing Guidelines.*

restitution. *Booker* also identified and established the primary sentencing mandate of Section 3553(a):

The Court shall impose a sentence *sufficient but not greater than necessary*, to comply with the purposes set forth in [18 U.S.C. §3553(a) (2)]. Mr. Lustyik now asks the Court to consider his unique, personal circumstances before imposing a sentence that is "sufficient but not greater than necessary." More specifically, it is respectfully submitted that Mr. Lustyik be sentenced to the time of incarceration that he has already served and impose a term of probation. If the Court imposes a sentence that includes a component of incarceration, the Court should permit such component to be satisfied by home confinement. These sentences would be reasonable under *Booker*, and would comply with the statutory sentencing factors the Court considers. The following is a discussion of salient points the Court should consider in deciding to grant a variance from the advisory calculations of the Federal Sentencing Guidelines.

## NATURE AND CIRCUMSTANCES OF THE OFFENSE

Mr. Lustyik's case arises out of his unwarranted and illegal mixing of personal and professional interests. In April of 2011, Lustyik met Taylor at a college football game in Rhode Island. Taylor was a successful private security contractor. Mr. Lustyik learned that Taylor had a number of friends and contacts within the FBI, throughout the Middle East, and around the world. Further, Mr. Lustyik ascertained that Taylor was working with the FBI in the San Diego California office. Ultimately, Mr. Lustyik determined he could develop his professional and personal goals by working with Taylor to develop him as a valuable FBI confidential source,

which built bridges into private employment and provided cash benefits.

During the fall of 2011, Taylor advised Mr. Lustyik that his company was being investigated by the Department of Defense for contract fraud related to projects in the Middle East. Taylor's company had received $54 million from Department of Defense contracts. Taylor reached out to Mr. Lustyik in order to defeat his impending indictment. Prior to the indictment, Mr. Lustyik had been developing Taylor both for the benefit of the United States, the FBI and himself. By engaging in deception of law enforcement agents and federal prosecutors who were pursuing charges against Taylor, Lustyik hoped to salvage a valuable confidential source and secure a respectable and lucrative position in Taylor's enterprises.

Following the direction of Taylor, Mr. Lustyik coordinated with his childhood friend Johannes Thaler ("Thaler") to dissuade and prevent any charges against Taylor from moving forward. To accomplish this Mr. Lustyik, made material misrepresentations and omissions to federal law enforcement agents and prosecutors regarding his relationship with Taylor, used a "dead-drop" email account to communicate the details of the scheme, interviewed potential witnesses in the case against Taylor, and organized or solicited bribes from Taylor. Mr. Lustyik engaged in this behavior to protect his business relationship with Taylor. Communications between Thaler and Mr. Lustyik indicate that they believed they had legitimate multi-million dollar business opportunities in brokering oil, providing security equipment and developing energy resources.

Eventually Mr. Lustyik's use of Taylor as a confidential FBI source broke down. Mr. Lustyik was admonished by his supervisors, and directed to cease communicating with Taylor.

Mr. Lustyik failed to abide by this directive, eventually the use of Taylor as source was elevated to the D.C. headquarters. Shortly thereafter Taylor was indicted in this case. Mr. Lustyik again contacted law enforcement agents and sought to dissuade them from further investigating Taylor. Mr. Lustyik was not successful and while returning to the United States from Lebanon, Taylor was arrested and had his electronics seized. Knowing he had engaged in criminal activity regarding Taylor, Mr. Lustyik sent Thaler a text indicating that, "you might have to save me and testify that only you r doing business whim." Nine days later Thaler told federal law enforcement agents that Lustyik was not involved with Taylor or Thaler's business.

## THE HISTORY AND CHARACTERISTICS OF MR. LUSTYIK

Mr. Lustyik's life up to the point of his crimes hardly paints a portrait of a deceitful dishonorable person motivated by greed or self-interest. Unlike many people that appear in this Court for sentencing, Mr. Lustyik's life up to the point of his crimes can be summarized by a few poignant words: *Adversity, Service, and Dedication.*

Mr. Lutyik's life began with adversity. He was born in the village of Sleepy Hollow, New York with a pronounced cleft pallet. As a young boy he endured at least 20 surgeries to repair his deformity. *See*, attachment #9. None were very successful and he still retains a pronounced cleft pallet. As painful as those surgeries were, they did not compare to the isolation he endured from being the subject of constant teasing, ridicule and bullying. The bullying destroyed his self-esteem and caused him to be shy and reserved.

During his early teens, Mr. Lustyik grew and overcame his deformity and its emotional affects by participating in sports. Through sports he was able to expound on the values his parents taught him: dedication, discipline and a strong work ethic. In high school he was an exceptional athlete playing football and captaining the lacrosse team to a state championship. After graduating from high school he played football for 4 years at Susquehanna University where in 1984 he graduated with a degree in Environmental Science. Mr. Lustyik was no longer an isolated and shy boy; he was a strong, ethical and social member of the community.

After graduating from college he immediately began working near his childhood home with the Westchester County Department of Labs and Research as an environmental chemist. While interested in his work, Mr. Lustyik felt a higher calling and wanted to follow in the footsteps of his father and uncles to serve his county.[2] Public service is in Mr. Lustyik's blood. He decided to join the FBI because to him being a "G-Man" was the epitome of public service and he was committed to carry on the proud Lustyik tradition of public service.

In 1987, Mr. Lustyik began what would be a 25-year career as a counter intelligence agent for the FBI. His career as an agent was impressive and his service to this country is laudatory. His hard work and dedication ensuring our National Security earned him numerous accolades from all levels of the FBI and even the Director. *See* attachment #2. Mr. Lustyik to the extent he could, described his job as unique, demanding, and extremely fulfilling. However, his work also carried the heavy burden of directly facing acts of terrorism in our country. Mr. Lustyik was several city blocks away when the planes struck the Twin Towers. He witnessed

---

2 Mr. Lustyik's father served in the military as a member of the elite Army Rangers and his uncles were police officers. After leaving the Army, his father worked as a civil servant for the town of Sleepy Hollow until his death

8

first-hand people leaping to their deaths from the doomed towers. After the Towers collapsed, the area was designated as a crime scene within his jurisdiction. The rubble was transported to a secure location where law enforcement agents such as Mr. Lustyik tirelessly sifted through the debris searching for clues. Morbidly, Mr. Lustyk describes the horror of carrying a white bucket and having to place body parts he discovered in it. This horrific experience traumatized Mr. Lustyik as manifest by the many panic attacks he suffered in the years after 9/11 and the diagnosed PTSD he still suffers from. It's fair to say his experiences as an agent left him with permanent scars.

Unlike many people with high-pressure jobs, Mr. Lustyik did not turn to vices or substance abuse to cope with the pressures. Instead Mr. Lustyik coped with the pressures of his job by volunteering as a football coach and mentoring young men. One of those young men writes, " It is true that I was never the brightest student or the best athlete. I worked hard to get where I am at and Bob helped me with that. He was a constant push to better myself". *See,* attachment #12. Even at his lowest while incarcerated at the Weber County Jail, he mentored and supported a troubled young man. The mother of that young man writes, "I feel that Bob had a very great influence on Lance and was the turning point from Lance being almost suicidal to learning to remain calm, and cope with his incarceration." *See,* attachment #6. These are just a few examples of Mr. Lustyik's selfless character, which the Court should take into consideration. *See, U.S. v. Thurston*, 544 F.3d 22 (1st Cir. 2008)(after *Gall*, the Court affirmed district court's choice of 3 months rather than 60 month guideline term for Medicare fraud conspiracy of more than $5 million, citing, among other things, Thurston's charitable work, community service,

generosity with his time, and the spiritual support and assistance he provided others). In addition to work and mentoring, family has always played an important part in Mr. Lustyik's life.

Mr. Lustyik's shares his home with his wife Virginia and his children, Hannah, age 13, and Robert age, 10. His home is a short walk away from the home where he was raised. Other than college, Mr. Lustyik has never lived far from home. Entering the Lustyik's modest home - the home is sparsely furnished and the Lustyik's have never even had more then one vehicle between them - one is greeted by a small wooden sign in the living room that reads in bold letters, *"Family, our refuge from the storm, our link to the past and our bridge to the future"*. That sign is a memorialization of Mr. Lustyik's family bond. That bond has been tested but the Lustyik family remains dedicated to one another. *See* attachments *#3,4,5.*

Mr. Lustyik and his family have had to endure significant hardship. Virginia's mother Kathryn Mercante was diagnosed with terminal lung cancer. She came to live with the Lustyik's and Mr. Lustyik cared and was responsible for her while he was on home arrest until she passed away last month. Additionally, like Mr. Lustyik, his daughter Hannah was born with a cleft palate and the Lustyik's have always devoted much of their resources to reconstructive surgery for her. It should go without saying that Mr. Lustyik and his family suffer and will continue to suffer if he was sentenced to a lengthy period of incarceration.

When a defendant suffers consequences for his criminal conduct – apart from the sentence imposed through the criminal court process – the sentencing Court can take this collateral punishment into account in fashioning an appropriate sentence. *See, e.g.*, *United States*

*v. Gaind*, 829 F. Supp.669, 671 (S.D.N.Y. 1993) (granting downward departure where defendant was already punished by the loss of his business as result of EPA-related charges)

Since the investigation of this case in 2012 and the subsequent charges in September 2013, Mr. Lustyik has been subjected to extremely harsh collateral consequences. As a result of this case, Mr. Lustyik suffered the loss of his 25-year career as a counter intelligence agent[3]. He has been professionally and publicly shamed; national news immortalized him as that "Dirty FBI Agent". His reputation and felony convictions will forever preclude him from being employed from many jobs.

In addition, Mr. Lustyik has also been subject to harsh personal consequences. As a result of this case, many of his friends and associates at the FBI cannot or will not speak to him. Despite an outpouring of support for him in his community, he will forever be shamed in the small tight-knit village of Terry Town, New York. With his felony convictions, he will be barred from his passion of working and coaching young men. Moreover, Mr. Lustyik and his family have experienced harsh financial difficulties as a result of this case. See, United States v. Vigil, 476 F.Supp.2d 1231 (D. N.M. 2007) (imposing below-guideline sentence, in part, based on fact that defendant and his family "have endured the expense and emotional cost of two very lengthy, public trials" and have "incurred several hundred thousand dollars in attorney fees and costs" because "when evaluating the justness of Vigil's punishment for the purposes of reaching a reasonable sentence under United States v. Booker, it is important to consider all other forms of punishment Vigil has already suffered"). When this case was filed, in order to hire an attorney,

---

3 Mr. Lustyik was suspended from the FBI on September 18, 2012.

Mr. Lustyik emptied almost all of the Lustyik family savings and thrift savings fund/401K.

Shamefully, he even had to borrow money from family members. Moreover, his previous

attorney holds a several hundred thousand dollar lien on the Lustyik family home for attorney

fees. The Lustyik family have always been savers and lived frugally but with two young

children, and a potential lengthy incarceration for Mr. Lustyik, Mr. Lustyik and his family face a

difficult financial future. See, attachment # 3, 4. A lengthy period of incarceration for Mr.

Lustyik will only add to their suffering.


### FACTORS THAT WEIGH IN FAVOR OF DOWNWARD DEVIATION

(A)    The Seriousness of the Offense, To Promote Respect for the Law and To Provide Just
Punishment for the Offense


The present case obviously presents serious criminal conduct and serious offenses. By

Mr. Lustyik's own admission it tarnishes the image of the FBI. However, this conduct did not

involve guns, violence, or intimidation. Mr. Lustyik has taken this case and this Court seriously.

This is evidenced by his compliance with his pre-trial behavior and his post-plea self-surrender.

Mr. Lustyik's mixed-motive and intent in this case presents a unique consideration. While the

potential harm is serious, the nature of the harm is mixed: both in and against the interest of the

United States. While Mr. Lustyik was actively culpable, he believed that his goals of furthering

his own career and the national security of the United States were not mutually exclusive. Mr.

Lustyik illegally cooperated with Taylor to secure his own career after his tenure at the FBI. In

doing so, however, Mr. Lustyik believed that he was also furthering the goals of the United

States. Mr. Lustyik compromised his integrity, and willingly violated both the law and FBI directives, in order to protect Taylor from federal prosecution. Taken together, the acts in this case, and the underlying actions and motives of Mr. Lustyik, show that a below guideline sentence is warranted.

(B) To Afford Adequate Deterrence

Mr. Lustyik, and other similarly situated to him, will be deterred from future bribery crimes even when punishment is a probationary sentence or sentence to home-confinement. Individuals in positions to act on, or pursue, bribes and sophisticated obstruction are themselves sophisticated and often time white-collar or professional individuals. Research regarding white-collar offenders in particular (presumably the most rational of potential offenders) found no difference in the deterrent effect of probation and that of imprisonment. *see* also Zvi D. Gabbay, Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime, 8 Cardozo J. Conflict Resol. 421, 448-49 (2007)("[T]here is no decisive evidence to support the conclusion that harsh sentences actually have a general and specific deterrent effect on potential white-collar offenders."). Further, research consistently shows that while the certainty of being caught and punished has a deterrent effect, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects." Michael Tonry, The Functions of Sentencing and Sentencing Reform, 58 Stan. L. R. 37, 52 (2005), "Three National Academy of Science panels . . . reached that conclusion, as has every major survey of the evidence." Id.; see also Zvi D. Gabbay, Exploring the Limits of the Restorative Justice Paradigm:

13

Restorative Justice and White Collar Crime, 8 Cardozo J. Conflict Resol. 421, 447-48 (2007) ("[C]ertainty of punishment is empirically known to be a far better deterrent than its severity."). Mr. Lustyik's case only further demonstrates the certainty of punishment; Mr. Lustyik was prosecuted and is guilty despite his sophisticated background and scheme. Sentencing Mr. Lustyik to a sentence of probation or home confinement would serve the purposes of deterrent, because those similarly situated understand the significance of the collateral consequences of prosecution, guilt, and certainty of punishment.

(C) To Protect the Public from Further Crimes of the Defendant

As indicated above Mr. Lustyik is in a class of rationally acting defendants who are generally risk adverse. The public should not fear, and is not in danger of, Mr. Lustyik reoffending. While Mr. Lustyik is culpable in this case, after prosecution, guilt, and punishment it will be unlikely that he will ever engage in illegal behavior again. It should also be noted that Mr. Lustyik did not have a criminal history prior to this case. The collateral consequences suffered by Mr. Lustyik, and the continued support of his family, indicate that Mr. Lustyik will be a law abiding citizen for the rest of his life. Mr. Lustyik's personal characteristics, public service, and acceptance of guilt protect the public from future crimes by him.

(D) To Provide for Educational, Vocational Training, Medical Care, or Other Treatment.

This Factor weighs in favor of leniency. First, Mr. Lustyik has both professional and educational accolades; his guilt has already collaterally and negatively affected his vocation.

14

Second, Mr. Lustyik's post-conviction rehabilitative efforts have been exemplary (e.g., Caring

for his terminally ill Mother-in-Law; Mentoring incarcerated and suicidal teenager).  Third, Mr.

Lustyik's mental health needs are related to PTSD developed in the field as a counter-terrorism

agent, and his depression and anxiety as a result of this case. Incarceration will not alieve or

rehabilitate Mr. Lustyik's mental health issues; to the contrary it will antagonize them. The harsh

irony of incarceration here after is that the most important treatment opportunity is the familial

support. Allowing Mr. Lustyik to serve his punishment on probation or home confinement would

undoubtedly be the best alternative in terms of this factor. It will also allow Mr. Lustyik the

ability to re-integrate with his community, which will undoubtedly allow him to find vocational

opportunities after his punishment.


(E) The Kinds of Sentences Available

        Congress has provided no minimum sentence for the crimes that Mr. Lustyik has

committed. And, as argued herein §3553 factors support a sentence below the Guidelines range.

The United States Sentencing Guidelines themselves acknowledge that "[p]robation may be used

as an alternative to incarceration" *See, USSG Ch. 5, Part B, intro. comment.* The Courts have

imposed probation even in cases with the advisory guidelines suggested incarceration. *See, Gall*

*v. United States*, 128 S. Ct. 586, 594 n.2 (2007) (finding that Court did not abuse its discretion in

imposing a three year probationary term where guidelines called for sentencing within range of

30-37 months). Moreover, the Sentencing Guidelines also specifically provide for Home

Detention.  Section 5F1.2 tersely provides that "[h]ome detention may be imposed as a condition

of probation or supervised release, but only as a substitute for imprisonment."

Application Note 1 further states:

"Home detention" means a program of confinement and supervision that restricts the defendant

to his place of residence continuously, except for authorized absences, enforced by appropriate

means of surveillance by the probation office.  When an order of home detention is imposed, the

defendant is required to be in his place of residence at all times except for approved absences for

gainful employment, community service, religious services, medical care, educational or training

programs, and such other times as may be specifically authorized.  Electronic monitoring is an

appropriate means of surveillance and ordinarily should be used in connection with home

detention. After being incarcerated for 464 days, Mr Lustyik was confined to his home for 243

days and monitored by pre-trial services. See also, U.S. v. Romualdi, 101 F.3d 971(3d Cir.1996)

("it may be proper to depart because of the ... home detention [a defendant] had already served.")

After his home confinement, he travelled back to Utah where he surrendered to the U.S. Marshall

and was placed in the Weber County Jail. During his home confinement Mr. Lustyik was only

permitted to leave his home to visit his attorney in New York. He had strict conditions as he

could not even take his children to school. It is understood that pre-trial services will notify the

Court only on the occasion of a breach of release conditions. For Mr. Lustyik then, while he was

on home confinement, no news for the Court was good news and there was no record of him

violating his home release. It is respectfully suggested that Mr. Lustyik's success on supervision

is a compelling indication that he would continue to succeed on supervision. It is respectfully

suggested that the above-referenced Guidelines provisions are aptly applied to Mr. Lustyik.

16

(F) Policy Statements Of The Commission of Congress

On January 9th, 2015, the United States Sentencing Commission ("USSC") issued a news release concerning the guideline amounts under §2B1.1, governing fraud offenses, clarified the definition of "intended loss," and changed the enhancement related to the use of sophisticated means in a fraud offense. U.S. Sentencing Commission Seeks Comment on Revisions to Fraud Guidelines, Increase in Hydrocodone Sentences, U.S. Sentencing Commission, News Release, January 9th, 2015, accessed at, http://www.ussc.gov/sites/default/files/pdf/news/press-releases-and-news-advisories/press-releases/20150109_Press_Release.pdf. The commission hoped to address criticism raised by members of the bar, and judges, who find, "that the fraud guideline may be fundamentally broken." While the proposed policy changes do not directly affect Lustyik in this case, the motivation for change does.

The American Bar Association, on November 10th, 2014, published a report regarding the reform of federal sentencing for economic crimes. A Report on Behalf of The American Bar Association Criminal Justice Section Task Force on the Reform of Federal Sentencing for Economic Crimes, American Bar Association Criminal Justice Section, November 10th, 2014, http://www.americanbar.org/content/dam/aba/uncategorized/criminal_justice/economic_crimes.authcheckdam.pdf.  The task force responsible for the report consisted of five professors, three judges, six practitioners, two organizational representatives, and observes from the Department of Justice as well as the Federal Defenders. The commission's proposal is a structured approach to enhancing or quantifying fraud offense (or in this case bribery offense) characteristics.

The commission recommends that in considering offense characteristics the court should

17

consider: loss, culpability, victim impact, and special considerations. First, the loss category

dramatically lowers the current schedule, for example in this case the loss (bribe) would fall

between $100,000 and $1,000,000, with an enhancement of +6. *Id*., at 2. Second, the model

proposes subtractions or additions based on the level of culpability. *Id.*. This case should be low

to moderate culpability, subtracting between 0 to 5 points. Mr. Lustyik's culpability was

*Ligitimate ab initio*, he was a highly decorated FBI agent seeking legitimate human sources who

later fell, blinded by bribes plus the potential for a respectable, high, and stable position in what

was potentially a legitimate business. *Id.*. Mr. Lustyik, while guilty of being bribed and

obstructing justice, held a "mixed-motive," where he did not see helping Taylor as mutually

exclusive with helping the United States. Mr. Lustyik also had a potential gain that was *Less than*

*loss*, in that he did not have a firm or official position, and was not related to the underlying

potential loss created by Taylor. *Id.*. It also appears that while Taylor made many promises to

payments, few materialized. While it is true that Lustyik is sophisticated, and used sophisticated

means, his victims, the United States, the United States Attorneys, and the FBI, are all equally

sophisticated and well equipped. It also appears that the loss caused by Mr. Lustyik paled in

comparison to the potential loss caused by Taylor, and was not influential in Taylor's

procurement fraud- which doubtlessly involved cooperation with other agents of the United

States. Finally, it appears that Lustyik acted through the FBI, properly elevating Taylor as a

potential source all the way to FBI headquarters.

In all, the structured policies presented by the American Bar Association result in a

subtraction in enhancements between 6 and 11 points. While the policies have not been formally

adopted by the USSC, the USSC has recognized the need for change and begun adapting its policies. Further, the USSC's own statistics show that Courts have acted unilaterally to avoid harsh and unnecessary sentences portrayed in the guidelines range.

(G)      The Need to Avoid Unwanted Sentencing Disparities

When considering an appropriate sentence for Mr. Lustyik 18 U.S.C. § 3553(a)(6) instructs the court to impose a sentence that, "avoid[s] unwarranted disparities among defendants with similar records who have been found guilty of similar conduct." *See United States v. Booker*, 543 U.S. 220, 261-262 (2005). It is, of course, extremely difficult to fully assess the bases and relevant characteristics of other cases that have resulted in the sentences imposed therein, and trickier still to compare them to the present case. It is also difficult to locate similar cases, considering different types of executive branch bribery cases. In this case we deal with an FBI agent, other cases involve elected public officials, public officials, military personnel and leaders, or governmental contractors; each of these cases have their unique confidential aspects. However, these difficulties do not prevent the court from recognizing that bribery cases are often sentenced well below the "heartland" of Mr. Lustyik's 151 to 188 month guideline recommendations.

It is also difficult to analogize or distinguish this case nationally, because the Government is in a unique position to know about, but not present, classified case-specific factors that are not in the public record. A review of the public docket and public pleadings available therein, suggests there is further material information, unavailable to the defendant. It is, however, likely

that other cases involving public officials, or military personnel, contain classified materials.

Even considering the aforementioned, Mr. Lustyik stands in a similar position to individuals who

have received sentences well below Mr. Lustyik's guidelines in cases similar or more egregious

than his own.

- In the Middle District of Georgia, United States District Judge W. Louis Sands sentenced three individuals for their conduct, in 2011, related to bribery causing losses to the United States Marines in excess of $907,000. Michelle Rodriguez, base supply technician, was sentenced to 70 months; Thomas Cole, operator of a private company, 46 months; Fredrick Simon, operator of a private company, 32 months. The bribes were related to the award of contracts for machine products related to the rebuilding and repairing of ground combat and combat support equipment used in Afghanistan, Iraq, and other parts of the world. The scheme involved altered equipment codes, falsified bills of lading, and other fraudulent activity in addition to bribery.[4]

- In the Central District of Utah, United States District Judge Dale A. Kimball, sentenced three individuals for their conduct between 2008 and 2011, related to a conspiracy to commit bribery and procurement fraud on the United States Hill Air Force Base in Ogden Utah. In that case Sylvester Zugrav and Maria Zugrav, private business operators, offered approximately $1,240,500 in payments and other things of value to the procurement program manager of the Air Force base, Jose Mendez. Jose Mendez disclosed non-public information, government budgets. All three took steps to conceal their activity including using covert email addresses, encrypted documents, code words, and false names. Jose Mendez was sentenced to 24 months prison, Sylvester Zugrav was sentenced to 15 months prison, and Maria Zugrav was sentenced to 24 months probation.[5]

---

[4] *Georgia Woman Pleads Guilty to Conspiracy to Commit Wire Fraud Related ot Transportation Scheme at Local Military Base*, Department of Justice, U.S. Attorney's Office, Middle District of Georgia, October 10th, 2013, http://www.justice.gov/usao-mdga/pr/georgia-woman-pleads-guilty-conspiracy-commit-wire-fraud-related-transportation-scheme; *Three Georgia Residents Sentenced for Their Roles in Bribery Scheme Related to the Award of Government Contracts*, Department of Justice, Office of Public Affairs, June 6th, 2013, http://www.justice.gov/opa/pr/three-georgia-residents-sentenced-their-roles-bribery-scheme-related-award-government.

[5] *Department of Defense Procurement Official Sentenced for His Role in Contract Bribery Scheme*, Department of Justice, Office of Public Affairs, January 29th, 2014, http://www.justice.gov/opa/pr/department-defense-procurement-official-sentenced-his-role-contract-bribery-scheme; *Florida Couple Sentenced for Roles in Procurement Contract Bribery Scheme*, Department of Justice, Office of Public Affairs, January 8th, 2014, http://www.justice.gov/opa/pr/florida-couple-sentenced-roles-procurement-contract-bribery-scheme; *Florida Couple and Utah Man Indicted for Alleged Roles in Procurement Fraud Scheme Involving Foreign Military Materials*, Department of Justice, Office of Public Affairs, October 12th, 2011, http://www.justice.gov/opa/pr/florida-couple-and-utah-man-indicted-alleged-roles-procurement-fraud-scheme-involving-foreign.

While these cases are not identical to Mr. Lustyik's conduct in this case, they are similar. First, the cases involve individuals in positions of trust within the executive branch of the United States. Second, the individuals involved took steps to compromise the efficacy and trust in our military. Third, the individuals engaged in covert and fraudulent activites in order to conceal their crimes and avoid detection and prosecution. Fourth, the individuals accepted bribes affecting the availability and efficacy of our military equipment or support to troops on currently on the ground; Taylor's conduct was also related to improper procurement conduct. Finally, the bribery amounts are much higher than the $300,000.00 attributed to Mr. Lustyik; Mr. Lustyik did not even receive the $300,000.00, but instead believed a position might be created for him.

"Statistics published by the United States Sentencing Commission support the conclusion that sentences substantially below Guidelines range are the norm for convictions under the federal bribery statutes.  Those statistics include the following findings:"[6]

- Of the 134 sentences imposed under Guideline § 2C1.1 nationwide between October 2013 and June 2014 (excluding cases in which the Government sponsored a departure), 60 percent of cases (81 sentences) had a below-Guidelines sentence.[7]
- That trend holds true for prior years: 2013 (100 of 187 § 2C1.1 sentences below Guidelines); 2012 (83 of 151 sentences below Guidelines); 2011 (80 of 177 sentences below Guidelines); 2010 (88 of 177 sentences below Guidelines).[8]
- Among those bribery defendants sentenced below the Guidelines range in the most recent Sentencing Commission Data Report, the median sentence was 5 months.  The median

---

6 Defendant Robert F. McDonnell's Sentencing memorandum, Case No. 3:14-cr-00012-JRS, Document 582, filed Governor of Virginia, was sentenced to two years imprisonment, with an offender level of 32, in a case regarding bribery and abuse of the highest State Office.).12/23/14, page 38. (*United States V. Robert F. McDonnell*)(Where Defendant Robert F. McDonnell, former

7  See U.S. Sentencing Commission Preliminary Quarterly Data Report, Fiscal Year 2014 3rd Quarter Release, Table 5, available at http://www.ussc.gov/sites/default/files/pdf/research-and-publications/federalsentencing-statistics/quarterly-sentencing-updates/USSC-2014-3rd-QuarterlyReport.pdf.

8 See 2010-2013 Quarterly Sentencing Updates, available at http://www.ussc.gov/research-and-publications/federal-sentencingstatistics/quarterly-sentencing-updates.

decrease in months from the Guidelines minimum was 15 months, or 75.7 percent below the low end of the Guidelines range.[9]

- In the Tenth Circuit, the mean bribery sentence during Fiscal Year 2013 was 39 months, out of four cases. The national bribery sentence mean was 29 months, while the median was 22 months, out of a 182 cases.[10]

While this case is also difficult to analogize and distinguish from other cases the national statistics strongly indicate that bribery conduct is sentenced well below the guidelines ranges (especially considering the steep enhancements related to value). Courts have countered the high bribery guideline ranges by sentences more in line with 18U.S.C. §3553(A).

In assessing whether the sentence is necessary and sufficient to ensure the satisfaction of the 18 U.S.C. 3553(a) factors, it is important to consider the disparities among co-defendants. A review of the conduct of the co-defendants, or uncharged co-conspirators, may be more relevant to understanding sentencing disparities. Comparing the potential sentences, or lack thereof, of individuals in this case will allow the court an opportunity to compare very similarly situated individuals.

Regarding Michael L. Taylor. Taylor pled under Rule 11(c)(1)(c) to one count in this case subject to a 17 to 24 month penalty. Taylor is the mastermind and organizer of the conduct in this case. Taylor dangled the prospect of millions of dollars before Mr. Lustyik. Taylor also promised to help Mr. Lustyik care for the medical expenses of his young daughter.

Regarding Johannes W. Thaler. Thaler pled under a Rule 11(c)(1)(c) to one count with a

---

9 (Fiscal Year 2014 3rd Quarter Release at Table 12)
10 See U.S. Sentencing Commission Statistical Information Packet, Fiscal Year 2013, Tenth Circuit, Table 7, available at http://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/state-district-circuit/2013/10c13.pdf .

penalty of 13 months. As discussed throughout this case Thaler was similarly situated to Lustyik throughout the case. Mr. Lustyik's conduct was substantially similar to Thaler's, the only difference is that Mr. Lustyik pled without any agreement with the Government.

Regarding uncharged federal agents. In Mr. Lustyik's attempt to protect Taylor from federal criminal indictment in Utah he met with an interviewed a number of federal law enforcement agents or administrators. Mr. Lustyik worked with a fellow FBI agent in San Diego to develop an understanding of Taylor's background, in order to "get Taylor open" as a confidential human source. *Presentence Investigation Report,* Mary Schuman, United States Office of Probation and Parole, Revised Report, March 16th, 2015, point 53. After opening Taylor as a confidential source Mr. Lustyik worked with other agents regarding his potential use. Specifically, Mr. Lustyik indicated to Taylor that, "this will come down to the egos of the ausas. They won't want to lose. So since they will have 15 special agents against them as witnesses they will fold." *Id.*, point 41. It is also apparent that Mr. Lustyik worked through the FBI to incorporate Taylor as a confidential human source. *Id.*, point 79. While Mr. Lustyik ultimately exceeded his authority in working with Taylor as a human source, it is not apparent that he did not believe his actions were concurrent and non-exclusive with the interests of the United States. These unnamed or identified individuals who coordinated with Mr. Lustyik demonstrate the extent to which Taylor was used or trusted as a potential source.

## CONCLUSION

Incorporating the aforementioned facts and analysis Mr. Lustyik should be granted a probation sentence, and barring that, a sentence to home confinement. A consideration of the 18

23

U.S.C. 3553 factors warrant a significant departure from the sentencing guidelines. Mr. Lustyik accepts his guilt and is very remorseful; His fall from grace cost him his profession, his family's financial security, his reputation and community leadership, and his honor. Mr. Lustyik is a first time offender, before this and his New York case, whose criminal acts have had significant collateral effects. Mr. Lustyik will realign his future with his successful past, incorporating his original values of integrity, dedication, and service. As seen on pre-trial release, and incarceration, Mr. Lustyik is a compliant and conscientious offender. A review of the letters of support, and Mr. Lustyik's successful past, demonstrate a man of character who has significant social support. A lower guideline sentence will be sufficient and necessary to maintain a respect for the law, impose a just result (retributive) for the conduct, deter both Mr. Lustyik and others similarly situated to him from committing future crimes, protect the policies and practices for sentencing, and avoid unwarranted sentencing disparities. If granted his requested sentence Mr. Lustyik will eventually be able to successfully re-integrate into his local Terry Town, New York and larger American communities.

DATED this 23rd day of March, 2015.

/s/ Michael J. Langford
Michael J. Langford
*Attorney for Robert G. Lustyik*

24