RAYMOND HULSER, Acting Chief
Peter Koski, Deputy Chief
Maria N. Lerner, Trial Attorney
U.S. Department of Justice
Criminal Division, Public Integrity Section
1400 New York Ave. NW, 12th Floor
Washington, D.C. 20530

M. KENDALL DAY, Acting Chief
Ann Marie Blaylock Bacon, Trial Atty
U.S. Department of Justice
Criminal Division, Asset Forfeiture and
   Money Laundering Section
1400 New York Ave. NW, 10th Floor
Washington, D.C. 20530

CARLIE CHRISTENSEN, Acting U.S.A. (#633)
Karin Fojtik, A.U.S.A. (# 7527)
U.S. Attorney's Office, District of Utah
185 South State Street, Suite 300
Salt Lake City, Utah 84111-1506
Telephone: 801.524.5682
Facsimile:  801.524.6924

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | Case No.  2:12-cr-645 (TC) (DBP) |
| v. | **GOVERNMENT'S SENTENCING MEMORANDUM** |
| ROBERT G. LUSTYIK, JR., | |
| Defendant. | |

The United States, by and through undersigned counsel, respectfully submits this sentencing memorandum in aid of the Court's sentencing of defendant Robert G. Lustyik, Jr. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") calculated range of 151 to 188 months' incarceration, as determined in the Presentence Report ("PSR"), is accurate, and a sentence within that range would satisfy the purposes and goals of sentencing as set forth in 18 U.S.C. § 3553.

The crimes to which Lustyik pleaded guilty are grave.  Bribery especially "cannot properly be seen as a victimless crime, for in a sense it threatens the foundation of democratic government. . . . [B]ribery tears at the general belief of the citizenry that government officials will carry out their duties honestly, if not always competently.  And that harm, though it may at times appear intangible, is real." *United States v. Hayes*, 762 F.3d 1300, 1309 (11th Cir. 2014).

Citizens have the absolute right to expect that the conduct of their law enforcement agents, especially those working in counterintelligence for the FBI, would be above reproach, would be a model of rectitude, would enforce the laws and would, importantly, punctiliously and scrupulously obey those laws themselves. Lustyik, however, worked against that principle, abused and indeed *flaunted* his authority, violated his oath of office, sold his badge, and exhibited contempt for the trust placed in him by the law enforcement agents in Utah with whom he dealt, the prosecutors with whom he spoke in Utah, and indeed his own colleagues, supervisors, and the very agency he worked for. This, along with his demonstrated contempt for the criminal justice system in attempting obstructing not just Taylor's case, but also his own, justify a sentence between 151 and 188 months.

I.     **FACTUAL BACKGROUND**[1]

    A.     *Hatching of the Bribery Scheme*

Almost three years ago, in about October 2011, defendant Michael Taylor and defendant Robert Lustyik, a veteran Special Agent for the Federal Bureau of Investigation ("FBI") Taylor had met just months before, concocted a scheme to make Lustyik wealthy beyond his dreams. That scheme also involved Lustyik putting an end to a grand jury investigation being conducted in the District of Utah.

The grand jury in Utah was investigating Taylor, his company American International Security Corporation ("AISC"), and others regarding allegations of fraud in the award and performance of a Department of Defense contract, and of money laundering to conceal the source and ownership of the proceeds derived from the contract. Four federal law enforcement agencies were involved in that investigation: the Department of Defense's ("DoD") Defense

---

[1]     The sentencing memoranda for Lustyik, Michael Taylor, and Johannes Thaler contain the same Factual Background section.

Criminal Investigative Service ("DCIS"), the Department of Homeland Security ("DHS"), the Internal Revenue Service ("IRS"), and the Army Criminal Investigative Division.

Just a month before Taylor and Lustyik worked out their scheme, over $5,000,000 of Taylor's assets had been seized in a related matter. In the weeks after his money was seized, Taylor forwarded Lustyik the contact information for two of the agents working the investigation. Exh. A-3. Taylor wanted Lustyik to reach out to them to convince them not to seek criminal charges against Taylor. *Statement by Defendant Taylor in Advance of Plea of Guilty*, Doc. 536 at 4 (hereinafter "Taylor's Plea"). Moreover, Taylor dangled substantial carrots in front of Lustyik for his help: a six-figure salary after he left the FBI, and a share in the proceeds of several multi-million dollar business deals he was pursuing. *Id.* The *quid pro quo* was not only obvious, but in many cases, flagrant and brazen. For example, in an email conversation discussing Taylor's case, where Lustyik told Taylor "there is no way they indict you," Lustyik later told Taylor, in the same email thread, that they have to "lock down" an oil drilling contract in the South Sudan. Exh. A-13.

     **B.**    *Lustyik Recruits Thaler into the Bribery Scheme*

Lustyik readily accepted the prospect of the millions Taylor dangled before him, and he recruited one of his most trusted friends to assist him — his co-defendant Johannes Thaler, with whom he had been friends since childhood. Lustyik understood that the scheme he concocted with Taylor was illegal. Exhs. A-143, A-164, A-165, A-167. *See also* Exh. A-91 (April 17, 2012 email from Lustyik to Taylor: "The rate this is going. I will be indicted way before u ever are !!"). Lustyik needed insulation so that the bribes could not easily be traced back to him, and so that he would have some modicum of plausible deniability. Exhs. A-113, A-131, A-136.

Lustyik needed someone whom he could trust unconditionally — someone who would even be willing to lie for him if Lustyik's scheme were found out.  Exh. A-165.  In that respect, he chose wisely in Thaler, because Thaler did just that:  when interviewed by Special Agents of the Office of the Inspector General, Thaler denied that Lustyik had any involvement in the business dealings between him and Taylor, Exh.  B at 13-14, and denied that Taylor had paid money intended to be given to Lustyik.  Exh. C at 30–31.

That Thaler's primary purpose was as a conduit between Lustyik and Taylor, rather than a business partner for Taylor, is clear by the fact that Thaler was entirely out of his element in the sorts of business deals Taylor was pursuing, *see, e.g.,* Exh. A-3 ("I don't know anything about oil or South Sudan"), and Taylor himself stated that Thaler added little value.[2]  Moreover, Thaler was fully aware of his role — not only did Lustyik keep Thaler regularly apprised of Taylor's criminal troubles, but Thaler clearly understood he was to solicit and accept bribe money from Taylor on Lustyik's behalf.  A number of text and email conversations confirm this:

- In an email discussion between Lustyik and Thaler dated October 25, 2011, Lustyik told Thaler "taylor is looking for a way to take care of me so I said u n I r working together on these and he said he will be sending money ur way . . . He has 2 contracts they r about to sign.  I think he might want to give us 200 gs."  Thaler responded "ok.  let me know what you want me to do with it."  Exh. A-7.  Indeed, in a later text message exchange, dated March 7, 2012, when Lustyik asked Thaler if Taylor had provided money for Lustyik, purportedly to cover surgeries for Lustyik's minor daughter, Thaler responded "Just did. 10 tomorrow 200 later."  Exh. A-49.  The next day, on March 8, 2012, Lustyik pressed Thaler:  "Any word on that 200 for [Lustyik's daughter] cause half is to Uncles Hannes."  Exh. A-52.

---

[2]     Indeed, when this bribery scheme began, Taylor had no idea who Thaler was — in an October 27, 2011 email to the secretary of an Ambassador to the United Nations, Taylor misidentified Thaler as "Hannes Tee."  Thaler's email address is *hannestee*@yahoo.com.  Taylor then forwarded that email to Lustyik, and asked "What is the last name of Hannes?"  Exh. A-8.

- In a text message conversation between Lustyik and Thaler dated December 28, 2011, Lustyik asked Thaler: "Like r we making money? Like soon? . . . Like Mike said 'hannes, u n bob r about to make money' ?" Thaler responded "Yes." Exh. A-25.

- On March 3, 2012, Lustyik texted Thaler: "We have to craft an email to MT in which u ask him if u should be expecting to bring anything back for your friends daughter wo my friend knowing….as if he is surprising me." Exh. A-45.  Thaler did just that; the very next day, Thaler emailed Taylor, stating "A while back, you mentioned something about helping out the big guy [Lustyik] with his daughters doctor bills.  I would love to surprise him with a little something upon my return.  He's been busting his ass trying to clear up your predicament . . ." Exh. A-46.

- On March 6, 2012, Lustyik texted Thaler: "Don't forget to mention to MT how hard I'm working on getting his shit pushed aside and how tough I'm having it with [Lustyik's daughter]'s recent surgeries.  Keep me in the loop . . . As soon as u have a handle on the funds let me know.  Thx." Exh. A-47.

- On May 28, 2012, Thaler emailed Taylor, stating "[i]t seems that there are a lot of possibilities coming up shortly.  It would be nice if something happened soon.  It would be a great 50th birthday present for the big guy." Exh. A-110.

- On July 31, 2012, Lustyik emailed Thaler, "Will we get any money from [a surveillance equipment deal Taylor was working on] ? And when?"  Thaler responded, "Hope so."  Lustyik instructed Thaler, "You should ask him ? Call him.  He will tell you.  He knows we need money.  I said it in an email." Exh. A-152.

- On September 12, 2012, several days after Taylor had been stopped at the border upon returning from a trip to Lebanon, and his electronics were seized as part of a border search, Lustyik texted Thaler, "Also did u ask MT about any money coming in?"  Thaler responded, "He's still waiting on deals to close.  It seems everything is on hold."  Lustyik responded, "But did u blatantly ask for money? He wants to give us (me) money for [Lustyik's daughter]."  When Thaler responded, "I didn't ask for money directly . . . I didn't know he was giving money for [Lustyik's daughter]," Lustyik replied "All coded.  I'm trying to get u some breathing room . . ." Exh. A-166.

C.     *The Quid — Tens of Millions of Dollars Promised to Lustyik and Thaler*

To ensure Lustyik was properly motivated to do whatever was necessary to keep him from getting indicted, Taylor offered Lustyik and Thaler an equal share in the proceeds of contracts he was pursuing, which, if he were successful in obtaining them, would have brought in tens of millions of dollars for all three of the defendants.  Exh. E at 4-5.  Taylor regularly kept Thaler and Lustyik apprised of his progress on these various business deals, and indeed both Lustyik and Thaler took an interest in the details of some of these contracts.  More importantly, Taylor was often very explicit about conditioning his promised millions on the success of Lustyik's efforts in obstructing the grand jury investigation in Utah.  In a text exchange dated January 31, 2012, Lustyik relayed to Thaler the promise Taylor made:  "When Im clear u will be [all] set. (Frm taylor)."  When Thaler asked "[w]hen is that ?", Lustyik responded "[f]orever."  Exh. A-30.

Other examples abound.  On December 20, 2011, Taylor emailed Thaler to apprise him of an oil deal Taylor was pursuing.  When Thaler asked how much oil was at stake, Taylor responded, "4 million barrels per month.  If they can only do 2 million barrels I can get the other 2 million from the Congo.  *Make sure you let the big guy know about this.*  We want him retired in 6 months to work with us.  *I'll make you guys more money than you can believe.  provided they don't think I'm a bad guy and put me in jail.*"  Exh. A-19 (emphasis added).  Thaler responded to Taylor, "[t]he big guy knows," and the next day, Thaler forwarded that email chain to Lustyik, stating "[c]heck this out."  Exh. A-20.  Just a few days later, in a text message exchange on December 28, 2011, Thaler provided Lustyik with more information on this deal: "5 mill per Month.  It looks like the oil deal is going to happen . . . Once [Individual 1] gets the

oil company name they sign a contract and write a check for the 60 million barrels . . . This deal is almost $5 billion [a year]." Exh. A-25. *See also* Exh. A-50.

On February 9, 2012, Taylor emailed Lustyik asking for an update on his case: "Dying to know how it's going. Also, I worked things out with Hannes for your baby." Exh. A-31. The same day, Lustyik texted Thaler, "I'm clearing up MT very well." When Thaler responded, "[j]ust talked to him. He told me to bring my bank wire transfer numbers to Lebanon," Lustyik explained "YES. He is giving me money "for [Lustyik's daughter]'s surgery"[3] . . . Hopefully 100gs." Exh. A-32.

While Taylor did not give Lustyik the hoped-for $100,000, he did give Lustyik $10,000, through Thaler. On February 11, 2012, Lustyik texted Thaler, "[w]e get acct # to taylor while he is there n money goes in." Thaler responded "I can get him the wire transfer acct #s on Monday." Exh. A-33. That is precisely what Thaler did. Exh. A-36. When Thaler traveled to Lebanon in early March 2012 to accompany Taylor to meetings relating to various Middle East business deals Taylor was attempting to obtain, Lustyik pestered Thaler several times to ask Taylor about getting the money for his daughter's "surgery." Exhs. A-47, A-49, A-51, A-52, A-55. On March 15, 2012, Thaler confirmed that Taylor had provided the expected bribe: "Capt [Taylor] put 10 in the account today." Exh. A-59. On March 19, 2012, Thaler's bank records show a transfer from Lebanon into Thaler's savings account in the amount in $10,000. The bank records indicate the transfer was made by a known associate of Taylor's and the purported purpose of the transfer appears as "Consultancy Fees." Exh. A-61.

Another bribe offered to Lustyik and Thaler by Taylor was the proceeds from a contract Taylor sought with Basra Electric to produce 150MW of power. Thaler calculated the net

---

[3]     The quotes surrounding the reference to Lustyik's daughter's surgery were inserted by Lustyik.

revenue to be $58 million per year, and Taylor replied to Thaler and Lustyik, "[n]ot bad for a start up company." Exh. A-66. Had that deal gone through, Lustyik and Thaler would have expected to each receive almost $20 million a year from it.

Lustyik and Thaler expected a lucrative salary from Taylor. While Thaler was in Lebanon with Taylor, Lustyik asked Thaler, "[h]ey what's my salary?" Thaler responded "$300g for u." When Lustyik asked Thaler what his (Thaler's) salary would be, and when it would start, Thaler responded, "[m]ine is the same. Should start at the end of March . . . That's our salary for Lebanon, not for being in the company or anything else." Exh. A-55. A few days later, while Thaler was still in Lebanon, Lustyik asked again, "[w]hat deal was getting us the 300 gs salary n where did it go?" Thaler responded "[t]he 300 is from the Leb wind farm." Exh. A-60. On March 18, 2012, Lustyik lamented his dilemma in a text to Thaler: "I can leave [the FBI] in June. But I'm afraid to if capt gets indicted n I'm not an agent I'm no help. Has he mentioned giving me-u a salary?" Exh. A-62. Lustyik admitted at his plea hearing that he was expecting Taylor to give him a job, *Plea Hr'g* at 44, and Taylor confirmed that he and Lustyik had discussed giving him a salary. Exhibit E at 10.

Another bribe that appeared near fruition, but for Taylor's legal troubles catching up with him, was a business deal to provide surveillance equipment in the Middle East. On June 3, 2012, Taylor emailed Lustyik to tell him "I also have a meeting [in the UAE] with the crowned prince of Abu Dhabi who happens to be the Min of Defense as well. They say they are interested in contracting with us for the Buckeye [surveillance system] and perhaps wanting 3 systems. That is 90 million a year and about 35 million for us." Exh. A-117. Eight days later, on June 11, 2012, Taylor emailed Lustyik and Thaler, stating "[t]his is the signed deal with the company of the crowned prince in Abu Dhabi. . . . their Minister of Defense wants 6 systems. Each system

sells for $30 million, each system gives us $20 million profit. If I sold it for less they would not be excited about it." Exh. A-123. To this email Taylor attached an executed distribution agreement between Taylor's company and a company in the UAE. *See also Taylor's plea* at 5 (confirming Taylor's intent to share the millions of dollars in profits on this deal with Lustyik and Thaler). That same day, Thaler texted Lustyik, "[d]id [Taylor] mention anything about the Buckeyes?" Lustyik responded, "[y]ea. Said we r rich." Exh. A-126. When Thaler followed up with Taylor a month later, on July 10, 2012, Taylor informed Thaler, "Believe me, I'm pushing as fast as I can because 5 Aug they may charge me. Once they do I can't come here to do work." Exh. A-141.

Other examples of bribes offered or solicited are abundant:

- In an email exchange between Lustyik and Taylor dated March 28, 2012, where Taylor updated Lustyik on the status of his case, Lustyik told Taylor, "They have no witnesses. They have no case. This has been your cross to bare but w Easter comes a rebirth !! I believe you are soon to be vindicated." Taylor responded, "I'm not leaving [Lebanon] until we get at least 50 million in contracts. Unless they charge me then I have to come back." Exh. A-82.

- In a text message from Thaler to Lustyik on May 21, 2012, Thaler wrote, "MT says that the Anbar thing is almost ready to go. He's expecting $15 in the next 30-45 days." Exh. A-106.

- On August 3, 2012, Taylor forwarded an email to Lustyik about an opportunity to bid for a contract to provide security for the Super Bowl in 2014. Taylor stated, "FYI: Seems we have a shot at getting this provided I'm not in jail." Exh. A-154.

- In an August 6, 2012 email exchange, Taylor and Lustyik discussed obtaining gold to resell it for a profit. Taylor told Lustyik, "[y]ou owe me nothing because I never gave you anything. I will settle medical bills for a little Angel." Lustyik responded "I want to make good. I cannot thank you enough for all you have done and are doing?" Taylor replied, "[a]re you nuts-all you have been trying to

do for me.  Shame on you, don't you thank me."  Lustyik settled this dispute by replying, "[l]et's just get Utah over with and get stinking rich."  Taylor agreed, stating "[g]etting stinking rick, we are well on the way with that so I have that ball."  Exh. A-156.  Lustyik's optimism from this email exchange leaked into a text message to Thaler two days later, on August 8, 2012:  "We will be rich by Halloween. . . . I mean like RICH.  Aug 18th we should see some money though." Exh. A-157.

There were so many business deals Taylor was trying to secure for the three of them that Thaler wrote a note to himself to keep track of them:

    Benders $500 mil
    Baneasa $22 mil
    China $1.2 bil
    UAE $160 mil
    Salah al din $125 mil
    Drilling $400 mil
    Exxonmobil ?
    Oil deal ?
    Al Anbar $15 mil
    Pick up and lay down ?
    MRE $600,000
    200MW Europe proj $440 mil

Exh. A-148.  See also Exh. E at 11.

Taylor also admitted at his plea colloquy that he offered Lustyik millions of dollars to induce Lustyik to help him out of his (Taylor's) criminal troubles.  Taylor admitted to seeking a power generation contract in Iraq potentially worth $50 million, a contract for security and surveillance equipment in the UAE potentially worth $100 million, and a contract to broker 4 million barrels of oil from Iraq to China.  *Taylor's plea* at 4.

Lustyik was also anxious to share the news — and his expected new wealth — with others close to him; in an email to a friend dated June 30, 2012, Lustyik wrote, "[i]f you haven't heard the rumors....I've made us all stinking rich !!!! So you and I need to discuss what you want to do with like a million dollars I will be giving you by the end of august.  For 30 years I've

sacrificed to get to this point….and now Hannes and I are days away.  I was thinking we should build a mini football-sports stadium and just host all the big games there ? You should be dreaming big now." Exh. A-137.  If there was any doubt that the invocation of Lustyik's daughter was merely coded language for bribes flowing from Taylor to Lustyik and Thaler, rather than a genuine cry for help, that email exchange undermines such doubt.  Lustyik dreamed big — if he truly did need assistance to cover his daughter's medical bills, he saw no reason to settle for just the amount he needed to cover those bills, a pittance in comparison to the tens of millions Taylor promised him they could make together.  As Thaler succinctly put it in a March 18, 2012 text message to Lustyik, "[w]e'll be set for generations if this happens the way we're setting this up . . . The money is crazy." Exh. A-62.

### D.       The Quo — Lustyik Fulfilled His End of the Bargain

Lustyik made numerous efforts to hold up his end of the bargain, some more successful than others.  A number of these steps did, however, have an actual effect on the Utah investigation.

For example, Lustyik opened Taylor as a confidential human source in mid-January 2012.  Any federal law enforcement agent is aware that the calculus changes for targets who are cooperating with the government — their chances of indictment, or of having to do significant or any jail time, substantially decrease.  Lustyik was aware of this, and even acknowledged that "a paid source is tough to indict." Exh. A-179.

Almost immediately after signing up Taylor as a confidential human source, Lustyik began calling one of the federal agents investigating Taylor in Utah, and attempting to convince him that Taylor had done nothing wrong, and it would be foolish to indict him.  Lustyik followed this up with a video teleconference with the Assistant United States Attorneys (AUSAs) on

Taylor's Utah case, which was held on March 1, 2012.[4]  Lustyik spent the call informing the AUSAs of how valuable Taylor was, and how laudatory Taylor's prior handlers had been of the work Taylor previously did for the FBI.  Lustyik believed he was successful on that video teleconference, texting Thaler that evening that "I really sent a scare into those ausas today." Exh. A-40.  A few days later, on March 7, 2012, Lustyik wrote to Taylor "[s]eems we sent them into a reevaluation of MT and his potential knowledge of incident based on our SVTCC [secure video telephone conference call].  We have now developed enough to get our HQ [headquarters] to intervene and that's what I will be selling Monday." Exh. A-54.

In addition to this video teleconference, Lustyik interviewed a number of Taylor's handlers, who had worked with him 15 to 20 years earlier.  While doing these interviews, Lustyik was so convinced of their devastating effect on the Utah investigation that he wrote to Taylor on March 9, 2012 that "[w]e got some huge info that wil make it impossible for utah to indict u now.  We will have it over next week I believe." Exh. A-56.  That same day, Lustyik texted Thaler "[j]ust did another interview.  MT has no chance of indictment now.  I own Utah." Exh. A-55.

Lustyik did not stop there.  On April 3, 2012, he wrote an email to one of the agents handling the Utah investigation, asking him "Can't we just get [Taylor] to be a CW [cooperating witness] for you guys ??" Exh. A-175.

Lustyik also intended on taking more direct steps to put an end to the Utah investigation:

- On March 28, 2012, Lustyik wrote to Taylor to inform him about an email he received from one of the Utah investigators, and about Lustyik's efforts to end the Utah investigation:  "As an investigator, [the Utah law enforcement agent's email]

---

[4]  During his plea colloquy, Taylor admitting not only to knowing that this phone call was being made, but also knowing it was part of the bribery scheme. Nov. 27, 2012, M. Taylor Sentencing Tr. at 35–36.

shows me that he is in panic mode.  He can't re-interview the people we have spoken with, and there really isn't anyone left for him to speak with. . . . What he is telling me is that he must have been chastised by [the Utah prosecutor] because now they have NO witness list. . . . Your lawyer should press the issue and ask them to 'reconsider' your offer to cooperate. . . . [Another FBI agent] and I are meeting w [a retired FBI agent] next week.  He is your only 'critic' but I've led him to where we need him to be. . . . Now he is on the 'nice list.'"  Exh. A-81.

- Lustyik texted Thaler on March 24, 2012 that "the ausa called again n basically said that mike is gonna be left alone."  Thaler responded, "[t]hat would be great.  As soon as that happens we get some $.  Capt will be very grateful."  Exh. A-68.

- In an email exchange between Lustyik and Taylor dated April 20, 2012, Lustyik asked Taylor, "[c]an you think of anyone else that we can neutralize with an interview [in addition to the persons Lustyik interviewed for the purpose of creating the laudatory 302s] ? Someone who they might try to use against you that we could go speak with that would basically ruin their offensive ? Where are Harris n Young ?" Harris and Young were the two men ultimately indicted with Taylor in the case that Lustyik was trying to obstruct.  When Taylor provided Lustyik with information on Harris's and Young's whereabouts, Lustyik responded, "I am going to interview Young [whose status was then a target of the same federal grand jury investigation looking into Taylor] and just blow the doors off this thing."  Exh. A-92.

- On June 4, 2012, in one of the numerous conversations in which Lustyik updated Thaler on his efforts to free Taylor of his criminal troubles in Utah, Lustyik bragged about his efforts to get Taylor free of those troubles:  "I'm on a freedom tour." Thaler's reply was "[y]ou're the new Harriet Tubman!"  Exh. A-119.

- In a June 26, 2012 email exchange between Lustyik and Taylor, after Taylor brought Lustyik up to speed on another witness the Utah investigators were interviewing, Lustyik told Taylor that he too wanted to interview that witness.  Exh. A-133.

- Lustyik intended to take this as far as necessary, telling one of the Utah agents he would testify for Taylor at a trial in Utah, if it came to that.  Exh. A-196 at 5.

- On July 2, 2014, Lustyik texted one of the Utah agents, telling him "Looks like we r going to be doing another set of interviews. Did u guys interview [Individual 2]?" Exh. A-201. Individual 2 was a witness in the underlying Utah investigation – there is no indication that Individual 2 had anything to do with Taylor's cooperation with the FBI.

- When Taylor's indictment in Utah was imminent, he emailed Lustyik on August 15, 2012, to let Lustyik know the Criminal Chief in the U.S. Attorney's Office in the District of Utah told Taylor's attorney the indictment was going to happen. Taylor further told Lustyik, "[u]nless someone tells him to stop." Lustyik replied, I'm on it." Exh. A-159.

Generating classified material from the information Taylor gave him was one of the steps Lustyik took in his official capacity to fulfill his end of the bribery scheme. Whether there was any value to the information Taylor provided is beside the point: there is no evidence that Lustyik and Taylor intended to form a handler-confidential source relationship until *after* they concocted their bribery scheme. Lustyik was also very clear with Taylor about what affect the classified information would have on Taylor's case in Utah: "I'm banking on Utah being scared off by the [classified] file [Lustyik created on Taylor]. They don't seem to care if ur helping. They just want to see what the file has that will ruin their case." Exh. A-151.

Finally, the wire fraud counts to which Lustyik pleaded guilty, Counts Two through Nine in the Indictment, provide specific examples of the steps Lustyik took to obstruct the Utah investigation. Count Two charges the March 1, 2012 video teleconference discussed above, and Counts Three through Nine charge several text messages, an email, and a phone call Lustyik made, all intended to intimidate the Utah agents into abandoning their pursuit of charges against Taylor for fear that those charges would not stick. Exhs. A-175, A-196, A-198, A-199, A-200, A-201, A-202, A-203.

E.      *"I'm so sneaky" — Concealment of the Bribery Scheme*

Lustyik went to great lengths to conceal his illicit relationship with Thaler and Taylor from the FBI.  When interviewed, none of his fellow FBI agents and supervisors, many of whom had in one way or another assisted Lustyik in the course of handling Taylor as a confidential source, were aware that Lustyik had solicited and accepted bribes from Taylor, and was actively involved in derailing a federal criminal investigation into Taylor in Utah.  Lustyik had told his colleagues repeatedly that there was no substance to the allegations against Taylor in Utah.  His colleagues had no reason to disbelieve Lustyik — he was a respected veteran of the FBI.

As noted above, Lustyik tried to conceal his involvement in the scheme by using Thaler as a conduit between himself and Taylor.  Thaler was kept closely apprised of the status of Taylor's case, and he kept Lustyik closely apprised of the status of Taylor's business deals.  *See e.g.,* Exhs. A-7, A-45, A-46, A-47.  Lustyik even told Thaler that in order to insulate Lustyik, Taylor would not talk money with Lustyik directly:  Thaler asked Lustyik on June 19, 2012, "[d]id MT mention anything about business?"  Lustyik replied, "[h]e won't with me."  Exh. A-131.  When Lustyik thought he made headway in his obstructive efforts, Thaler often heard first: on June 22, 2012, Lustyik texted Thaler, "Wanna fill u in on MT.  I got it fixed.  I'm so sneaky." Exh. A-132.

Even after Taylor was closed for cause as a confidential source in early July 2012, and Lustyik was instructed to have no more contact with him, the communications between the two continued, and Lustyik continued to apprise Taylor of steps he wanted to take to get him out of his legal troubles in Utah.  In a July 27, 2012 email where Lustyik purports to inform Taylor of people he wants to introduce Taylor to, in order to keep him active as a confidential source, Lustyik wrote "I will set it up n let u know.  When u r 'closed' we r not allowed to have contact.

Of course I will be violating this...just keep it in mind when u speak w ur lawyers." Exh. A-150. When Taylor asked whether Lustyik would be at the meeting that Lustyik was trying to schedule for Taylor, Lustyik responded "I will violate policy and be at the intro." *Id.*

Lustyik was fully aware of the consequences of getting caught for engaging in the illegal scheme. In the closing days of the conspiracy, Taylor returned from Lebanon carrying his cell phone and laptop computer; Taylor was detained at the border on September 8, 2012, and his cell phone and laptop computer were seized. Taylor (using his son's cell phone) called Thaler to tell him and told him what had happened, and Thaler in turn told Lustyik. Lustyik's immediate response was, "[g]reat. Now I go to jail too . . . I'm so fcuked. I told him not to travel w electronics." Exh. A-164.

> F.    *"You might have to save me and testify that only you r doing business w him"* —
>        *Obstruction of This Case*

On September 9, 2012, the day after learning that Taylor's laptop was seized at the border, Lustyik texted Thaler, "MT mightve gotten me jammed up n sent to jail so he better come thru . . . He really fcuked up. You might have to save me and testify that only you r doing business w him." Exh. A-165.

That is precisely what Thaler did. On September 18, 2012, during a search warrant at his home, Thaler agreed to be interviewed by Special Agents from the Office of the Inspector General. Though asked a number of times, Thaler denied that Lustyik was involved in the business dealings between him and Taylor. Exh. B at 13-14.

The next day, September 19, 2012, Lustyik received a visit to his home by one of his former colleagues, FBI Special Agent Andrew Dodd. During that conversation in Lustyik's home, Lustyik instructed Agent Dodd to destroy an FBI file on a former target of an FBI investigation, who was also one of the business partners in the scheme that Lustyik, Taylor, and Thaler had concocted. Exh.

16

G at 86-87.   Agent Dodd's reaction to this request is found in the excerpted portion of the transcript attached as Exh. G.

## II.   <u>PROCEDURAL HISTORY</u>

On October 18, 2012, a grand jury in the District of Utah returned an eleven count indictment charging Lustyik, along with Taylor and Thaler, with conspiracy to commit bribery and obstruction of justice, honest services wire fraud, obstruction of the due administration of justice, and obstruction of an agency proceeding.  Doc. 39.  After substantial motions practice on the unclassified information in the case, and equally extensive proceedings involving the Classified Information Procedures Act, 18 U.S.C. App. 3, on the morning of trial Lustyik pleaded guilty to all charges in the indictment, without a plea agreement with the government.

## III.   <u>DISCUSSION</u>

A sentence within the Guidelines range would achieve the aims of sentencing under § 3553(a).[5]  Indeed, only a substantial sentence of imprisonment would be commensurate with the seriousness of the offense, promote respect for the law, and deter Lustyik and other similarly situated individuals — especially those at the forefront of the public trust, who are charged with investigating crimes and protecting the public from those who commit them — from engaging in similar corrupt activities.

---

[5]   The citations in this Memorandum to the U.S.S.G. are all to the 2013 Guidelines Manual.

A.     *The Sentencing Range Determined in the PSR is Accurate*[6]

The guideline calculation in the PSR accurately reflects the illegal conduct with which

Lustyik was charged in the Indictment. The government was able to briefly speak with counsel

for Lustyik to meet and confer on the outstanding disputed sentencing factors, but was not able

to reach a final resolution before counsel met with his client and filed his sentencing

memorandum. In light of the fact that it appears Lustyik has withdrawn all but one of his

objections – to the adjustment for his role in the offense – the government presents arguments as

to that enhancement only, but will be prepared to present arguments regarding the other

previously disputed factors if necessary.

The government bears the burden of proving any disputed enhancement or adjustment to

defendant's guideline calculations by a preponderance of the evidence. *United States v. Prieto-*

*Zubia*, 38 Fed. Appx. 520, 522 (10th Cir. 2002) (government must prove by a preponderance of

evidence at sentencing any facts in the PSR to which defendant objects); *see also United States*

*v. Valdez*, 225 F.3d 1137, 1142, 1143–44 (10th Cir. 2000). Additionally, "hearsay statements

may be considered at sentencing if they bear some minimal indicia of reliability," *United States*

*v. Damato*, 672 F.3d 832, 847 (10th Cir. 2012) (internal citations and quotations omitted).

There is more than sufficient evidence to establish by a preponderance of the evidence

that the application of the adjustment to Lustyik's Guidelines calculations for his role in the

---

[6] In its objections to the PSR, the government did not object to the two level reduction in Lustyik's total offense level, applying the reduction pursuant to U.S.S.G. § 3E1.1(a), Acceptance of Responsibility. Unlike his co-defendants, Lustyik elected not to provide a statement to the probation officer regarding his acceptance of responsibility, but instead intends to provide an oral statement at the sentencing hearing. Consequently, the government had no basis upon which to object at the time. If, however, Lustyik's statement at sentencing is far afield of what would justify a reduction for acceptance of responsibility (which the defendant must "clearly demonstrate[]"), the government may ask the Court to reconsider awarding Lustyik the two level reduction, *see* Doc. 896. Lustyik does not qualify for, nor will the government file a motion to grant him, a third level for acceptance of responsibility under § 3E1.1(b).

offense is appropriate.[7]  Under U.S.S.G. § 3B1.1(c), a two level increase is warranted if the

defendant "was an organizer, leader, manager, or supervisor in any criminal activity . . ."  "These

roles are disjunctive, meaning a defendant need only qualify for one of these roles to qualify for

an increase in his offense level."  *United States v. Snow*, 663 F.3d 1156, 1162 (10th Cir. 2011).

The Guidelines provide further guidance on how to apply this enhancement:

> In distinguishing a leadership and organizational role from one of mere management or supervision, . . . [f]actors the court should consider include the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others. There can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy.

U.S.S.G. § 3B1.1(c) comment. 4.

There are abundant examples that Lustyik took many of these steps in the course of the

bribery scheme.  He exercised exclusive decision making authority in fulfilling his end of the

bribery scheme through his official actions, by opening Taylor as a confidential source,

interviewing Taylor's former handlers and reducing those interviews to reports, and by texting

and calling the Utah investigators and prosecutors in order to intimidate them and frighten them

away from indicting Taylor.  *See* Exhs. A-198, A-199, A-200, A-201, A-202, A-203.

Lustyik also recruited Thaler to the scheme:  "taylor is looking for a way to take care of

me so I said u n l r working together on these and he said he will be sending money ur way . . .

He has 2 contracts they r about to sign.  I think he might want to give us 200 gs."  Thaler

responded "ok.  let me know what you want me to do with it."  Exh. A-7.

---

[7]   Although it is unlikely that it will need to do so, the government may call a witness during the sentencing hearing in the event it is necessary to meet its burden of proof on supporting the enhancements and adjustments to Lustyik's Guidelines calculation.

Lustyik's participation in the offense is extensive — he was in weekly if not daily communication with Thaler to learn of the status of the business deals he was expecting to profit from, he also communicated frequently with Taylor to report the numerous steps he was taking in attempting to undermine Taylor's case.

Lustyik played a central role in planning and organizing this bribery scheme — it was because of Lustyik that Taylor agreed to take on Thaler as a business partner, Exh. D at 5, and Taylor frequently communicated to Lustyik through Thaler (both about his criminal case and business deals Taylor was negotiating), as he had been instructed to do. *See, e.g.,* Exh. A-113.

It is fair to say that this entire bribery scheme could not have been hatched and put into motion but for Lustyik — Taylor needed a way to get out of his criminal trouble in Utah, and he needed someone with real influence in order to make that happen. It is often said that the FBI is the nation's premiere law enforcement agency; what better tool to use to destroy another federal agency's investigation into Taylor than an FBI agent? Lustyik's clear disdain for the Utah investigators and prosecutors made it clear he believed that too: "I own Utah." Exh. A-55. *See also* Exhs. A-40, A-56, A-57, A-64, A-74, A-81, A-92, A-118.

For all these reasons, there is a preponderance of evidence that at a very minimum, Lustyik was an organizer of the bribery scheme to which he pleaded guilty, and thus a two level enhancement under § 3B1.1(c) is appropriate.

      B.     *A Sentence of 151 to 188 Months Would Achieve the Aims of Sentencing.*

In determining the appropriate sentence in this case, the Court must consider the factors enumerated in 18 U.S.C. § 3553:

    (1)     the nature and circumstances of the offense and the history and characteristics of the defendant;

    (2)     the need for the sentence imposed—

> (A)     to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B)     to afford adequate deterrence to criminal conduct;
>
> (C)     to protect the public from further crimes of the defendant; and
>
> (D)     to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>
> (3)     the kinds of sentences available;
>
> (4)     the kinds of sentence and the sentencing range established for . . . the applicable category of offense committed by the applicable category of defendant as set forth in the [U.S. Sentencing Guidelines] . . .

All of these factors support a sentencing within the Guidelines range determined in the presentence report.

### 1.     The nature and circumstances of the offense and the history and characteristics of the defendant

The serious crimes to which Lustyik pleaded guilty, and particularly the way he committed those crimes, justify a sentence within the Guidelines range.  Had he not been caught, Lustyik might have pulled off an egregious effort to become incalculably wealthy in exchange for selling his badge and oath of office.  Examples abound of the gravity of the crimes Lustyik committed, his premeditation in doing so, and his complete lack of remorse, hesitation, or shame. The factual section in this Memorandum contains merely a fraction of the more salient actions Lustyik took during the course of the bribery scheme.  Lustyik's history and characteristics only serve to underscore that a Guidelines range is the most appropriate sentence in this case.

In not objecting to the enhancement for multiple bribes, U.S.S.G. § 2C1.1(b)(1), Lustyik acknowledges that during the course of the conspiracy, this was not an isolated incident, but part of an extended effort to make himself wealthy beyond belief.  There is overwhelming evidence that multiple bribes were offered, solicited, paid, and/or received during the bribery scheme.  As

the factual background section above details, there were at least the following specific bribes offered, solicited, paid, and/or received:

- The $10,000 payment paid into Thaler's account, intended for Lustyik but split between the two (Exhs. A-32, A-33, A-36, A-59, A-61);[8]

- A $300,000 salary for Lustyik and Thaler for anticipated work on a wind farm project in Lebanon (Exhs. A-55, A-60);[9]

- Approximately $40 million for each defendant, from profits from the sale of surveillance equipment on which Taylor was able to secure a distribution agreement (Exhs. A-117, A-123, A-126).

In addition to those specific instances, Thaler's note to himself about the other pending projects (Exh. A-148) offers overwhelming evidence that it was not just these three deals that would bring all three defendants immeasurable profit.

Moreover, Lustyik did not take just one official act to obstruct Taylor's investigation in Utah. As described above, Lustyik took multiple actions over an extended period of time, "including but not limited to opening [Taylor] as an FBI confidential human source; seeking to interview potential witnesses and targets in the Utah investigation; and using his official authority and position to contact the federal law enforcement agents and federal prosecutors in Utah to dissuade them from charging [Taylor]." Doc. 39 at 6. *See also* Exhs. A-40, A-54, A-55, A-60, A-81, A-92, A-175, A-179. In return, Taylor offered not just one bribe, but "corruptly offered and provided a stream of things of value . . . ." Id. at 5. *See also* Exhs. A-19, A-31, A-55, A-60, A-123.

---

[8]   *See also Thaler Plea Agreement*, Doc. 904, at ¶ 5, admitting that the facts in the Indictment (which included allegations regarding this payment at ¶¶ 21, 22, 24, 26, 29, and 30) "fairly and accurately" describe his actions and involvement; Exhibit E at 3–4.

[9]   *See also Lustyik plea h'rg* at 44; *Thaler Plea Agreement*, Doc. 904, at ¶ 5, admitting to the facts in the Indictment (which included allegations regarding this salary at ¶ 28); Exhibit D at 10.

In withdrawing his objection to the twelve-level enhancement for the value of the bribe, Lustyik also admits that the amounts involved were not merely to meet any purported financial hardship he may have been facing, but were for the sole purpose of making himself "stinking rich." In addition to the three bribe payments paid or offered, noted above, (the $10,000 payment to Lustyik, the $300,000 expected salary, and the $40 million expected profits from the sale of surveillance equipment), there is also evidence that Lustyik stood to earn approximately $19.3 million in profits annually from a power generation contract with Basra Electric that Taylor was negotiating. Exh. A-66. In other words, the twelve-level enhancement is the bare minimum the Court should consider in calculating the bribe payments paid, offered, or solicited during the course of the conspiracy; there is evidence that Lustyik expected at least $60 million as a result of the bribery scheme he and his co-defendants concocted.

In withdrawing his objection to the two-level enhancement for obstructing the instance case, Lustyik admits to the very conduct the Court should consider as part of its sentencing decision – ensuring that Lustyik will not commit any such crimes in the future. Lustyik committed three obstructive acts once he realized that facing the consequences of his criminal conduct was imminent. The first is instructing Thaler to testify and lie for him. Specifically, on September 9, 2012, one day after learning that Taylor's electronics (computer and phone) had been seized at the border upon Taylor's return from Lebanon, Lustyik wrote to Thaler: "MT mightve gotten me jammed up n sent to jail so he better come thru" and also instructed Thaler: *"You might have to save me and testify that only you r doing business w him."* Exh. A-165 (emphasis added). In sending Thaler this instruction, Lustyik suborned, or attempted to suborn, perjury, U.S.S.G. § 3C1.1 comment. 4(B).

The second obstructive act is attributable to Lustyik through comment 9 of the Commentary for U.S.S.G. § 3C1.1: Lustyik aided and abetted Thaler's providing a materially false statement to a law enforcement officer that significantly obstructed or impeded the official investigation or prosecution of this case, conduct which is intended to be covered under this Guidelines provision. U.S.S.G. § 3C1.1 comment. 4(G). Specifically, nine days after Lustyik attempted to suborn Thaler's perjury, Thaler followed through with Lustyik's instructions. When a search warrant was conducted at Thaler's home on September 18, 2012, Thaler consented to be interviewed regarding his involvement in the scheme charged in the indictment, but denied that Lustyik had any involvement in the business ventures between him and Taylor, *even when specifically asked about it*. Exh. B at 13–14. In a second interview a few days later on September 21, 2012, Thaler again lied to investigators, this time about the $10,000 payment from Taylor via Thaler for Lustyik. Exh. C at 30–31. This is precisely why Lustyik recruited Thaler into this scheme – to ensure that if he was in danger of getting caught, he could rely on someone he trusted unconditionally to try and get him out of facing the consequences of his illegal conduct.

Lustyik took a third obstructive act the day after a search warrant was executed on his home in conjunction with this investigation. On September 19, 2012, Lustyik received a visit to his home by one of his former colleagues, FBI Special Agent Andrew Dodd. During his conversation with Agent Dodd in Lustyik's living room, Lustyik instructed Agent Dodd to destroy an FBI file of an individual who was one of the business partners in the scheme Lustyik concocted. Exh. G at 86-87. In so doing, Lustyik "direct[ed] . . . another person to destroy or conceal evidence that is material to an official investigation or judicial proceeding (e.g.,

shredding a document or destroying ledgers upon learning that an official investigation has commenced or is about to commence) . . ." U.S.S.G. § 3C1.1 comment. 4(D).

These are not the actions of a man who deserves a break in the determination of his sentence; as if obstructing the due administration of justice in Taylor's underlying case were not enough, Lustyik also obstructed the due administration of justice in his own case.

Lustyik's crimes cannot be explained away as a simple one-time mistake, a momentary lapse of judgment, or an aberration. Lustyik communicated with his co-defendants sometimes on a daily basis, in a year-long complex corruption scheme. While committing the crimes to which he pleaded guilty in the District of Utah, he was simultaneously engaged in a similar bribery conspiracy — albeit with a different object — in the Southern District of New York. Lustyik's action were pre-meditated, extensive, shameless, and calculated to make him and his co-defendants rich through illegal means. Lustyik's crimes were not errant misjudgments; they were reflective of a thorough and complete willingness to break the law in a manner that deeply offends our justice system.

Lustyik's crimes also cannot be explained away by youthful indiscretion. Lustyik is 52 years old, was a 24-year veteran of the FBI when he committed these crimes and was trusted with secrets of national security that would have caused exceptionally grave danger to the national security if exposed (i.e., through his Top Secret security clearance). Presumably whatever he was able to learn in the way of upright living he would have learned already.

Lustyik's background has none of the hardships or depravity present for so many other defendants who come before the Court for sentencing. Lustyik had a solid upbringing, steady employment, and a supportive, loving family, which has several times appeared at court proceedings to support him. Lustyik's father was a respected member of the Tarrytown, NY,

community, a U.S. Army Ranger, and served as the Tarrytown Village Trustee for over eighteen years,[10] and Lustyik's brother served as a police officer.

While the text messages and emails detailing the corruption scheme point somewhat vaguely to financial hardship, this of course is no excuse, and indeed, the purported financial hardship claimed in the text messages and emails was immensely disproportionate to the tens of millions of dollars Lustyik sought to make through Taylor.  Moreover, the very financial hardship Lustyik claimed he suffered shows precisely how depraved his conduct was — Lustyik repeatedly referred to his daughter's medical condition as code for getting payments from Taylor.  Exhs. A-32, A-45, A-46, A-47, A-52, A-166.  In reality, Lustyik had a prestigious job with the FBI, a sought-after substantial federal salary, job security, and generous benefits that many people facing true hardship in America would be exceedingly grateful to have.  Others with more difficult hardships manage to refrain from engaging in extravagant bribery schemes to make ends meet.

The bribery scheme to which Lustyik pleaded guilty last approximately one year.  There were numerous times during that scheme when Lustyik could have made the decision to remove himself from it and put an end to it, but instead he pressed on, and with vigor.  Lustyik pressed on even after Taylor was closed for cause as a confidential source in early July 2012, and Lustyik was instructed to have no more contact with him.  Lustyik continued to communicate with Taylor regularly, continued to discuss their business dealings, and continued to apprise Taylor of steps he was taking to get Taylor out of his legal troubles in Utah.  Lustyik unabashedly told Taylor that he would violate policy and regulations to do so.  Exh. A-150.  Indeed, just before Taylor was closed for cause, Lustyik's efforts within his own organization show his desperation

---

[10]     *See http://www.findagrave.com/cgi-bin/fg.cgi?page=gr&GRid=98302295.*

to make certain his bribery scheme did not fail; in a June 29, 2012 email to the Intelligence

Analyst responsible for determining whether Taylor would be closed as a confidential source,

Lustyik wrote:

> I need to pay Taylor some money [for his services as a confidential source] to
> lessen his chance of being indicted, a paid source is tough to indict . . . Please try
> your best to persuade everyone down there that this guy is a GOOD guy and not a
> BAD guy. [Taylor's cooperation] could be saving a lot of soldiers lives here with
> this and maybe even prevent a war.

Exh. A-179 (emphasis in original).

For these reasons, the nature and circumstances of the offenses to which Lustyik pleaded

guilty, and the history and characteristics of the defendant, all support a sentence within the

Guidelines range established in the PSR.

    2.    The aims of sentencing

Sentences are to be imposed to reflect the seriousness of the offense, promote respect for

the law, provide just punishment for the offense, afford adequate deterrence to criminal conduct,

and protect the public from further crimes by the defendant.   18 U.S.C. §§ 3553(a)(2)(A) – (C).

A sentence below the established Guidelines range would not meet these aims of sentencing.

As noted above, Lustyik's crimes were grave — those tasked with upholding the

Constitution, safeguarding the national security, and protecting citizens from criminals must be

above reproach when it comes to their own conduct.  Lustyik flouted the rules, ignored the law,

showed disdain for his agency and the criminal justice system, all because Taylor floated 8-

figure bribes before him.  The evidence shows that he did not hesitate at any point during the

conspiracy.  Given the seriousness of his crimes and his complete disdain for the law and the

legal system, only a sentence within the Guidelines range would provide just punishment for

Lustyik's crimes.

Importantly, too, imposing a significant prison sentence for Lustyik would serve the purpose of deterring other law enforcement agents from engaging in similar misconduct. 18 U.S.C. § 3553(a)(2)(B). General deterrence has its greatest impact in white-collar cases, like this one, because these crimes are committed in a more rational and calculated manner than sudden crimes of passion or opportunity. *United States v. Peppel*, 707 F.3d 627, 637 (6th Cir. 2013) (quoting *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006). As one court noted,

> We need not resign ourselves to the fact that corruption exists in government. Unlike some criminal justice issues, the crime of public corruption can be deterred by significant penalties that hold all offenders properly accountable. The only way to protect the public from the ongoing problem of public corruption and to promote respect for the rule of law is to impose strict penalties on all defendants who engage in such conduct, many of whom have specialized legal training or experiences. Public corruption demoralizes and unfairly stigmatizes the dedicated work of honest public servants. It undermines the essential confidence in our democracy and must be deterred if our country and district is ever to achieve the point where the rule of law applies to all – not only to the average citizen, but to all elected and appointed officials.

*United States v. Spano*, 411 F. Supp. 2d 923, 940 (N.D. Ill. 2006).

Moreover, where corruption is exposed, "[i]t is important…for the public to realize that white collar criminals will not be dealt with less harshly than are those criminals who have neither the wit nor the position to commit crimes other than those of violence." *United States v. Brennan*, 629 F. Supp. 283, 302 (E.D.N.Y.) *aff'd*, 798 F.2d 581 (2d Cir. 1986); *see also United States v. Davis*, 537 F.3d 611, 617 (6th Cir. 2008) (noting that "[o]ne of the central reasons for creating the sentencing guidelines was to ensure stiffer penalties for white-collar crimes and to eliminate disparities between white-collar sentences and sentences for other crimes").

Finally, a substantial prison sentence would also serve the important aim of sentencing of protecting the public from further crimes by the defendant. Tellingly, while Lustyik was engaged in this bribery scheme, he was simultaneously engaging in a separate bribery scheme,

for which he pleaded guilty in the Southern District of New York.  Also troubling is the fact that when he learned that he might face the consequences of his illegal conduct, he sought to obstruct the case against him.  Even after he was arrested, he still did not learn his lesson.  He knowingly and blatantly violated the terms of his release, despite stern warnings as to the consequences if he did so, by directing $26,000 in cash be delivered to a potential witness.  These are the actions of a man who will not hesitate to commit crimes to line his pockets; in order to protect the public from additional crimes Lustyik may commit, a substantial prison sentence is warranted.

For all these reasons, a sentence within the Guidelines range established in the PSR should be imposed.

### 3.   The sentences available and the applicable Guidelines range

The Guidelines calculation determined in the PSR is a sentence between 151 to 188 months' incarceration.  Because defendant's total offense level is 34, he falls within Zone D of the U.S.S.G. sentencing table; the Guidelines do not contemplate a sentence short of significant jail time for sentences falling within that Zone.  A sentence of time served, or additional time to be served under the provisions of U.S.S.G. § 5C1.1(b), (c) or (d) (providing for probation, community confinement, or home detention), which apply to sentences within Zones A, B, and C, would simply not meet the aims of sentencing.

WHEREFORE, for the reasons stated above, the government submits that a sentence within the U.S.S.G. sentencing range of 151 to 188 months would satisfy the purposes and goals of sentencing as set forth in 18 U.S.C. § 3553, and asks the Court to impose a sentence within that range.

Respectfully submitted,

RAYMOND HULSER                          M. KENDALL DAY
Acting Chief                            Acting Chief

By: _/s/ Maria N. Lerner_____   By: _/s/ Ann Marie Blaylock Bacon_____
    Peter Koski, Deputy Chief               Ann Marie Blaylock Bacon, Trial Attorney
    Maria N. Lerner, Trial Attorney         Asset Forfeiture/Money Laundering Section
    Public Integrity Section